CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 04 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| REBECCA F. WOOD, | ) |
| Plaintiff | ) |
| v. | ) Civil Action No. 7:07cv234 |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant | ) |

## REPORT AND RECOMMENDATION

Plaintiff Rebecca Wood ("Wood") brought this action for review of the Commissioner of Social Security's ("Commissioner's") decision denying her claim for disability insurance and supplemental security income benefits under the Social Security Act. This case presents two issues on appeal. The first is whether the Commissioner erred by not according controlling weight to Wood's treating physiatrist, Dr. Chris Covington. The second is whether the Commissioner erred in finding that Wood did not suffer from a severe mental impairment. The undersigned is unable on the existing record to make an informed judgment as to each of these issues as the Administrative Law Judge ("ALJ") did not provide specific reasons for rejecting opinions from Wood's treating sources as to both her physical and mental condition. Because of the failure of the Commissioner to explain fully the reasons for rejecting the opinions of treating sources Dr. Chris Covington and psychologist Teresa Jarrells, this case must be remanded for further administrative consideration.

# I.

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

The Commissioner employs a five-step process to evaluate DIB claims. 20 C.F.R. §§ 404.1520, 416.920; see also Heckler v. Campbell, 461 U.S. 458, 460-462 (1983). The Commissioner considers, in order, whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Id. If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. Id. Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functioning capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform alternative work that

exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Wood, born in 1971, was a younger individual on the alleged onset date of February 2, 2000. Wood completed high school and obtained three associates degrees in accounting, management and banking and finance. (R. 485) Prior to the onset date, Wood worked for the Paralyzed Veterans of America, and claimed she began to suffer systemic malaise in the fall of 1999 due to a "significant allergy to unknown agents in the Federal Building where she is employed." (R. 126) Wood also complained of terrible migraines and indicated to her doctor that she had these symptoms only at work and they cleared up when she was out of the building. (R. 132) Her primary care physician at the time, Dr. David C. Walton, excused her from further work in the federal building and suggested "she should seek employment elsewhere, as I know of no real solution to her problem." (R. 126)

Wood claims disability based on a variety of ailments, including headaches, back and neck pain, depression and anxiety. The ALJ found that Wood has the following severe impairments: "history of pseudo tumor cerebri, obesity, fibromyalgia and degenerative disc and joint disease with chronic lumbrosacral strain." (R. 18) The ALJ noted that "[t]he evidence demonstrates that the claimant has anxiety, but this condition was not shown to impose disabling functional restrictions." (R.18)

Wood's medical records reflect that she first began complaining of migraine headaches in the fall of 1999 and was referred by her primary care physician to a neurologist, James T. Wilson, III, who saw Wood for a neurological consultation on September 24, 1999. (R. 148-50)

3

Wood had a normal CT scan and was treated with some medications, which provided a positive response for her headaches. (R. 146) Dr. Wilson next saw Wood two years later, in September, 2001, and Wood reported a marked exacerbation of her headaches because she lost her health insurance and stopped taking her medication. (R. 146) Dr. Wilson described Wood's complaints as follows:

> It includes lack of energy, double vision, blurry vision, dizziness, intermittent jerking of her legs. She also reports memory loss, chest pain, irregular heart beat with difficulty breathing. She has gravid depressive symptoms as manifest by lack of interest in most activities. She describes dysesthesia, speech problems, staring spells, and black out episodes. The symptoms described do not indicate seizure or seizure like activities. I note that a CT scan of her head completed in 1999 was reported as normal.

(R. 146) Dr. Wilson ordered an EEG, which was normal, and changed Wood's medications as she was pregnant. (R. 143-45)

Wood complained that she dislocated her hip during her pregnancy and began having low back pain in October, 2001. (R. 233) MRI studies of Wood's lumbosacral spine in February 2002 showed a "tiny left paracentral disc herniation at L5-S1. This appears to not affect the exiting nerve roots." (R. 154) A mild disc bulge was noted at L4-5, but no significant central or neural foraminal stenosis was noted. Her exam was otherwise unremarkable. Wood's medical records reflect obesity as well. (R. 153) During this period, Wood also reported that her migraines were improved and come and go. (R. 156-57)

The medical record reflects scant treatment between early 2002 and mid-2005.[1] Wood filed her application for social security disability benefits in February, 2005 and was examined by

---

[1] Wood was seen for a gynecological issue in January, 2003, and at the Bradley Free Clinic for sinusitis/bronchitis/chronic rhinitis in May, 2003 and April, 2004, a dental issue in April, 2004 and for a refill of her blood pressure medication. (R. 265, 229-32)

4

a state agency physician in April, 2005. At that time, Wood complained of multiple joint pain and recurrent migraine headaches. The physical examination by Dr. William Humphries noted slightly reduced neck range of motion and moderately reduced back range of motion due to pain in the left lumbar and sacroiliac region. Wood had negative straight leg raising. (R. 236) Wood was noted to have full upper extremity range of motion, but the range of motion of her hips was reduced, particularly on the left side, due to low back and left hip pain. (R. 237-38) Physically, Dr. Humphries diagnosed chronic left lumbrosacral strain; multiple arthralgias without evidence of joint deformity, active inflammation or significant diminished motion at this time; a history of migraine headaches; possible degenerative joint disease of the left hip; dizziness of unknown etiology and peripheral neuropathy of the right lower extremity of unknown origin. (R. 238)

Wood was admitted to Carilion Roanoke Memorial Hospital on May 11, 2005 with a diagnosis of orthostatic dizziness. A CT scan and MRI of the brain were unremarkable. Wood was put on an 1800 calorie, heart healthy, low sodium diet and started on Claritin and Tylenol, and was discharged with a Holter monitor. (R. 446-48) The monitor showed normal sinus rhythm. In a follow-up doctor's visit, Wood was restarted on her migraine medicine, which she had been off for many months. (R. 260) Wood also complained of multiple chronic musculoskeletal pain, especially triggered by normal activities such as grocery shopping or cleaning. (R. 260-61) Wood was referred to a neurologist for a headache consultation and was seen on July 22, 2005. On physical examination, Wood's cranial nerves were noted to be unremarkable, and there were no issues with her strength, coordination, sensory exam, reflexes and gait. (R. 251) The neurologist, Dr. William Tingler, suggested that for her complaints of joint pain, edema and fatigue that "[i]t would be very necessary for the patient to pursue a weight loss program." (R. 252) He also ordered a lumbar puncture to evaluate the possibility of a

pseudo tumor cerebri and a polysomnogram for evaluation of obstructive sleep apnea. (R. 252-52)

Wood was seen regularly by Dr. Tingler over the course of the next year for a possible pseudo tumor cerebri,[2] as well as for back pain and migraines. Dr. Tingler treated her with medications for the pseudo tumor cerebri and referred her to an opthamologist for visual field testing, which was reported to be normal. (R. 373) Dr. Tingler instructed Wood to avoid the use of opiate analgesics. (R. 251) Dr. Tingler's note indicates that as regards her complaints of diffuse pain, obstructive sleep apnea, and probable pseudo tumor, "I outlined to the patient that I believe her underlying abnormality that unifies all of these problems is her clear obesity. . . . If she was able to get to 190 pounds I believe a significant portion of her medical problems would improve. Once again I endorsed a mild morning exercise program of walking for thirty minutes at a time and once again she reports that she cannot do this due to pain. . . . I have no further recommendations." (R. 374) By April, 2006, Dr. Tingler noted improvement with Wood's headaches, stating that "[t]o the best of my ability to tell, I believe her migraines have greatly reduced." (R 367) The last visit with the neurological specialist in the record indicates further improvement with her headaches. (R. 390-91)

In November, 2005, both Wood's treating family doctor, Dr. Tarin Schmidt, and Dr. Tingler were asked by counsel to state whether Wood's condition meets Listing 12.07 (concerning somatoform disorders), and neither doctor was able to opine that such a listing was met. (R. 326, 343)

---

[2] Pseudo tumor cerebri is a condition involving increased intracranial pressure. It is "encountered most frequently in overweight women between the ages of 20 and 45. Headache is the most common presenting complaint, occurring in more than 90 percent of cases." Handbook of Ocular Disease Management, http://www.revoptom.com/HANDBOOK/SECT53a.HTM.

Wood's primary care physician referred her to Dr. Chris Covington, a physiatrist, for musculoskeletal concerns, including possible diagnosis of fibromyalgia. Dr. Covington first saw Wood on January 11, 2006 and continued to do so over the next few months. Dr. Covington's May 8, 2006 note indicates that her neck and back pain seemed more mood/stress driven. (R. 379) On her last visit in the record to Dr. Covington on June 14, 2006, his note recounts that "[s]ignificant legal form brought to my office at short notice. Informed that likely FM sx [fibromyalgia symptoms] not enough to claim disability – it will be the total of her problems that may or may not qualify her." (R. 396) In his letter to disability counsel of June 15, 2006, Dr. Covington noted that all of Wood's lab tests were negative and that her prognosis was "fair/good." (R. 399) Dr. Covington noted that Wood was tender at all locations of her body and her pain was usually characterized as a dull ache but can have superimposed sharp-shooting quality. (R. 399) Dr. Covington felt that Wood could tolerate a low stress job if the physical limitations can be met. (R. 400) Physically, Dr. Covington indicated that Wood's functional limitations restricted her to 15 minutes of sitting or standing at one time; "sit/stand/walk four hours altogether (pt lies down for nap 3-4 hours daily);" occasionally lifting ten pounds or less; occasionally twisting, stooping or climbing stairs; rarely crouching, squatting and climbing a ladder. Dr. Covington indicated that Wood's condition was likely to produce good days and bad days and that he estimated that she would miss more than four days a month. (R. 400)

In contrast to the opinion of Dr. Covington, the administrative record contains two other functional capacity evaluations done by state agency physicians. The first was completed by Dr. William Humphries in connection with his examination of Wood on April 13, 2005. (R. 235-40) Shortly thereafter, on May 27, 2005, Dr. Richard M. Surrusco completed a functional capacity evaluation based on a medical records review. (R. 243-48) These evaluations are consistent with

7

each other and conclude that Wood retained the functional capacity to work. Dr. Humphries concluded that Wood was limited to sitting six hours in an eight hour day and standing and walking the same amount.[3] Dr. Humphries limited Wood to lifting 25 pounds occasionally and 10 pounds frequently, and occasional climbing, kneeling or crawling. (R. 238) Dr. Surrusco's residual functional capacity evaluation was consistent with that of Dr. Humphries. (R. 248)

### III.

An ALJ is required to analyze every medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. § 404.1527 (d). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. § 404.1527 (d)(2); Social Security Ruling 96-2p. The ALJ is to consider a number of factors which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. § 404.1527. A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide her reasons for giving a treating physician's opinion certain weight or explain why she discounted a physician's opinion. Mastro, 270 F.3d at 178; 20 C.F.R.

---

[3] Dr. Humphries' examination report indicates that this time period could be reduced if imaging of her left hip showed degenerative joint disease. An x-ray taken of Wood's hip on May 18, 2005, however, was normal. (R. 240)

8

§ 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); SSR 96-2p ("the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").

The ALJ's discussion of Dr. Covington's disability opinion does not meet the Mastro standard. In essence, it consists of one line. "Although this physician opines that the claimant is unable to perform work even at the sedentary level, he has obviously based his assessment on the claimant's own representation and not on the evidence as a whole." (R. 20) There is no discussion of the substance of Dr. Covington's opinion, no discussion of the comparison of Dr. Covington's opinion with that of Dr. Humphries or Dr. Surrusco, and no discussion at all of how Dr. Covington's opinion meshes with his treatment notes or those of the other treating sources. Social security regulations, rulings and case law require more of the Commissioner than a one line, back of the hand, generalized rejection of a treating physician's disability opinion.

At the end of the day, it may well be that this claimant is not entitled to social security benefits. Even if that may be the end result of this case, the undersigned cannot short circuit the process and substitute his judgment for that of the Commissioner on the issue of Wood's disability. Wood is entitled, and the regulations, rulings and case law require, that her treating source opinions be fully considered and that specific reasons be provided for the weight given these opinions. The one line rejection of Dr. Covington's opinion in this case does not meet that standard. Thus, the undersigned is constrained to recommend that this case be remanded for

further administrative consideration and, in particular, to provide specific reasons for the weight and consideration given Dr. Covington's opinion.

## IV.

Wood next argues that the Commissioner erred by not finding her depression and anxiety to be a severe impairment. In order to qualify as severe, an impairment must significantly limit the physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521. "An impairment can be considered "not severe" only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984). While the medical records regularly refer to problems with headaches and more recently of neck, back and joint pain, there is scant reference in the record to any substantial depression or anxiety disorder. Indeed, none of Wood's treating doctors has ever referred her to a mental health specialist for any treatment.

Following the filing of her disability application, Wood was examined by state agency doctor William Humphries on April 13, 2005. As regards Wood's mental condition, Dr. Humphries noted the following:

> She is alert and oriented to three spheres. Speech is intelligible and sustained. No aphasia. Behavior is appropriate for this exam. Thought and idea content are within normal limits. Memory is intact for recent and remote events. Intelligence is within normal range. Affect and grooming are appropriate for this exam. She should be able to handle her own funds should they be awarded.

(R. 238)

Wood's records were reviewed by state agency psychologist Dr. Joseph Leizer, who provided an assessment on October 11, 2005, and Wood was seen and evaluated by Teresa Jarrell, M.A., on February 17, 2006, at the request of disability counsel.[4]

Based on his review of Wood's medical records, Dr. Leizer concluded that Wood did not have a severe impairment of an anxiety related disorder. (R. 270) Dr. Leizer cited the findings of Dr. Humphries noted above and a reference in the May 20, 2005 medical records of Wood's primary care physician Tarid Schmidt Dalton that, given her personality and anxiety, Wood might benefit from some treatment. (R. 282) Dr. Leizer noted that Wood is able to care for her child, receives significant help from her boyfriend and needs reminders to take her medicine. As a result, Dr. Leizer concluded that Wood was "[a]ble to do all levels of work. Consequently, disability allegations are not credible." (R. 282)

On the other hand, Teresa E. Jarrell, M.A., a licensed psychologist working with Psychological Testing Services, PLLC, saw and performed a psychological evaluation of Wood on February 17, 2006. Jarrell performed an MMPI-2[5] and Patient Pain Profile (P-3) and diagnosed Wood with major depressive disorder, single episode, severe without psychotic features; generalized anxiety disorder; undifferentiated somatoform disorder, history of intermittent explosive disorder and a personality disorder. Jarrell pegged Wood's GAF at 55.[6] Jarrell concluded as follows:

---

[4] Although not a physician, Jarrell is a licensed psychologist, and as such is an acceptable medical source under 20 C.F.R. § 404.1513.

[5] The MMPI-2 is a test of adult psychopathology "[u]sed by clinicians to assist with the diagnosis of mental disorders and the selection of appropriate treatment methods." Minnesota Multiphasic Personality Inventory®-2, http://www.pearsonassessments.com/tests/mmpi_2.htm#quickfacts/.

[6] A Global Assessment of Functioning ("GAF") of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

11

> Result of this evaluation indicate that due to the combination of emotional problems and pain severity in evidence at this time, Ms. Wood would not be able to meet the demands of sustained gainful employment. The somataform disorder, symptoms of depression, and symptoms of anxiety, will interfere greatly with her ability to meet demands of attendance, punctuality, pace and persistence. Her psychiatric symptomology, based upon the results of the two objective personality assessment instruments administered to her, is reflective of an individual with significant problems in maintaining emotional stability and concentration.

(R. 355)

The ALJ did not consider Wood's anxiety to be a severe impairment. Citing Dr. Leizer's psychiatric review technique, the ALJ noted that "[s]he presents no restriction of activities of daily living, no difficulties in maintaining social functioning, and only mild difficulties in maintaining concentration, persistence or pace." (R. 18)

As was the case with the ALJ's consideration of the opinion of Dr. Covington, the ALJ's analysis of Teresa Jarrell's evaluation is exceedingly thin. The ALJ does not address Jarrell's opinion in any detail, but rather only states that none of Jarrell's diagnoses "is really consistent with her description of the claimant's presentation." (R. 19) That is the extent of the analysis. The paucity of the ALJ's explanation is compounded by the fact that Jarrell's report is twelve pages long, single spaced. It is difficult, if not impossible, for a reviewing court to discern from the ALJ's terse remark just exactly what portion of Jarrell's diagnoses are at odds with Wood's "presentation." (R. 19) Jarrell's report details at length observations she made concerning Wood, ranging from her physical appearance to the manner in which she acted during the interview and her responses to the testing.[7] Plainly, the ALJ rejects Jarrell's opinion, but the analysis in the

---

[7] For example, as to her physical appearance, Jarrell commented that Wood "is an overweight Caucasian female. On the date of the evaluation, it appeared that her hair was shaved completely from the sides of her head. There was a small touch of hair that appeared from underneath the baseball cap that she wore." (R. 349) Jarrell's behavioral observations of Wood encompass two pages, and included problems with her rambling discussion,

12

ALJ's decision does not provide this reviewing court with what areas of Jarrell's diagnosis are inconsistent with how Wood appeared, acted and tested during the interview. Certainly, the ALJ does not agree with Jarrell's assessment, but, as with the case of Dr. Covington's opinion, he does not adequately address why he rejects Jarrell's opinions.

Further, the ALJ seems to suggest that Jarrell's conclusions are suspect because she "failed to provide any of the raw scores of the MMPI-2 test." (R. 19) As Wood points out, however, these raw scores were provided to the Commissioner and are part of the administrative record. (R. 451-53 ) Although these raw MMPI-2 scores are in the record, the court is incapable of evaluating them.

As a consequence, the undersigned is left wondering which of Jarrell's diagnoses the ALJ found inconsistent and the basis for that determination. In short, there is no way for the court to determine whether substantial evidence supports the Commissioner's decision that Wood has no severe mental impairment as the ALJ does not adequately explain his reasons for rejecting Jarrell's opinion. As such, this case must be remanded for further development of the record concerning Wood's claimed mental impairments. Such a remand should include a referral for a consultative psychiatric or psychological evaluation by a medical expert, including an assessment of the test scores in the administrative record and any other testing deemed appropriate by the Commissioner.

At the end of the day, the ultimate result may turn out to be the same for Wood. However, the regulations, rulings and case law require that the Commissioner explain, in sufficient detail to

---

memory, judgment and thought content. (R. 349-51) Following discussion of Wood's test results, Jarrell's report reflects moderate emotional distress, concentration and memory difficulties and "a number of symptoms that may reflect a psychotic process or a very long-term characterological condition." (R. 352) Jarrell considered Wood's prognosis to be poor, and noted that the "probability of meaningful long-term change is low." (R. 353)

13

permit meaningful judicial review, why he rejected the opinions of two of Wood's treating sources. A remand is necessary for that purpose.

The Clerk is directed to transmit the record in this case to Samuel G. Wilson, United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

**ENTER**: This 4th day of June, 2008.

_____
Hon. Michael F. Urbanski
United States Magistrate Judge